UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARK COONROD,

                 Plaintiff,

    v.

COLUMBUS MCKINNON
CORPORATION, *a foreign business
corporation*, KONECRANES, INC., *a
foreign business corporation*,

                 Defendants.

KONECRANES, INC.,

                 Third-Party Plaintiff,

    v.

ACE INDUSTRIES, INC.,

                 Third-Party Defendant.

Case No. 3:18-cv-01530-AR

**OPINION AND ORDER**

_____

**ARMISTEAD, Magistrate Judge**

In July 2016, Coonrod was working as a welder at Pierce Pacific Manufacturing (Pierce), when a hoist attached to a jib crane over his workstation came loose from its mounting hook and fell onto him, striking him on the head and shoulder, causing him serious injuries. In this product liability lawsuit, Coonrod brings claims against Columbus McKinnon Corporation (CMC), which is the manufacturer of the hoist and mounting hook, and defendant Konecranes, Inc., which sold the hoist to Pierce and later serviced it. Konecranes, in turn, brings a complaint against third-party defendant ACE Industries, which is a distributor for CMC.

Pierce purchased the hoist and mounting hook from Konecranes in 2014. Konecranes fulfilled Pierce's order through ACE. ACE attached the mounting hook to the hoist, tested the hoist and hook, and shipped it directly to Pierce. In 2015, the hoist was repaired by Konecranes. Sometime after the hoist was purchased in 2014 and before Coonrod's accident in 2016, the screw affixing the hook to the hoist was replaced with a non-CMC-approved screw.

Coonrod asserts the hoist's hook assembly is defective.[1] Coonrod alleges that CMC is strictly liable under chapter 30 of Oregon Revised Statutes and negligent for what he alleges are the hoist's design defects (Claims 1 and 2). Coonrod alleges that Konecranes is strictly liable for supplying the defectively designed hoist and is negligent for failing to use due care in servicing the hoist in April 2015 (Claims 3 and 4). As for the third-party complaint, Konecranes asserts that ACE is obligated by contract and common law to defend and indemnify Konecranes (Third-Party Claims 1, 2, and 3), and that it is entitled to contribution from ACE if it is liable for any of

---

[1]    Coonrod's complaint identifies the defective product as the jib crane. (Compl. ¶ 9, ECF No. 1.) In the summary judgment motions, the parties reference the hoist as the defective product. For clarity, the court refers to the hoist as the defective product.

Coonrod's claims (Third-Party Claim 4). ACE, alleging it distributed the hoist without alteration, brings a crossclaim against CMC (Crossclaim).

CMC, Konecranes, and ACE move for summary judgment on Coonrod's Claims 1 through 4. Defendants argue that it is undisputed that the accident was caused by modifying how the hoist was attached to the mounting hook and that Coonrod has failed to meet his *prima facie* burden of showing the modification was not essential to the accident, and he has not created a genuine issue of material fact on his product liability and negligence claims. Additionally, CMC and Konecranes assert that, under ORS § 30.915, there is no dispute of fact that the modification was a substantial contributing factor to Coonrod's injuries and they are entitled to summary judgment on that affirmative defense. As explained below, the court grants defendants' motions on Coonrod's Claims 1 through 4, grants ACE's summary judgment motion on Konecranes' Third-Party Claims 1 through 4, and grants CMC's motion against ACE's common law indemnity crossclaim.[2]

## BACKGROUND FACTS[3]

### A.    *The Hoist*

CMC designs and manufactures a product line of Budgit Manguard Electric Hoists. (Decl. John R. Burkey III ¶ 2, ECF No. 53-1.) CMC's Manguard Hoists come in a variety of lifting capacities, from a ¼ ton to 3-ton. (*Id.* ¶ 3.) Manguard Hoists have been on the market since 1989, and since 2004, more than 63,000 Manguard Hoists have been sold. (*Id.* ¶ 4.) Of

---

[2]    This court has jurisdiction under 28 U.S.C. § 1332 and all parties have consented to jurisdiction by magistrate judge under Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).

[3]    The facts are undisputed or are provided in the light most favorable to Coonrod. *Curley v. City of Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014).

those, over 38,000 have been ¼ ton to 1-ton capacity. (*Id.* ¶ 4.) Manguard Hoists may be sold

with or without an upper suspension. **(***Id.*** ¶¶ 3, 22.)** The Manguard Hoists may be suspended

overhead with a lug assembly or an upper hook assembly depending on customer needs and

preference. (*Id.* ¶ 3.) CMC sells the parts for the lug assembly and upper hook assembly

individually or as part of a suspension kit. (Burkey Decl. ¶ 15.)

    As relevant here, the upper hook assembly kit for the 1-ton Manguard Hoist consists of

four parts: (1) a lock washer (CMC lock washer); (2) a hex socket head cap screw (CMC screw);

(3) a suspension bushing keeper plate (CMC keeper plate); and (4) an upper hook. (Burkey Decl.

¶ 5; Decl. Aaron Guest ¶ 4 & Ex. 303 (attaching photograph of upper hook mounting kit, part

number LT913730), ECF No. 52-1 at 10.) The upper hook has a hexagonal base which is

threaded into a hole in the hoist's housing. (Burkey Decl. ¶ 7.) The CMC keeper plate rests on

the hoist's housing and partially covers the hook's hexagonal base to anchor the hook to the

hoist's housing. (*Id.* ¶ 8.) The CMC screw is installed through the CMC lock washer and CMC

keeper plate into a corresponding hole (retaining hole) in the hoist's housing. (*Id.* ¶ 9.) The CMC

screw is tightened so that the CMC lock washer is flush with the CMC keeper plate. (*Id.*) The

CMC screw has a locking adhesive bonded to its threads to prevent the screw from backing out

of the retaining hole. (*Id.* ¶ 10.) The CMC screw, CMC lock washer, and CMC keeper plate

secure the upper hook to the hoist's housing. (*Id.* ¶ 6.)

    By regulation, overhead hoists in use must meet the applicable requirements for

"inspection, maintenance, and operation, as prescribed by the manufacturer." 29 C.F.R. §

1926.554(a)(6). Regulations also require that overhead hoists be inspected regularly to check for

safety hazards. 29 C.F.R. § 1910.179(j)(1)(ii). The frequency of the required inspections, ranging

from daily to annually, is based on the hoist's exposure to wear and tear and nature of their

critical components. *Id.*

The Budgit Manguard Hoists Operation, Parts, and Maintenance Manual (Manual)

includes a Notice that states "Use only factory approved Budgit replacement parts, available

from Authorized Repair Stations or Budgit Hoist Distributors." (Burkey Decl. Ex. A at 2.) The

Manual lists "Do's" and "Don'ts," which include the following:

> o. DO inspect the hoist regularly, replace damaged or worn parts, and keep
> appropriate records of maintenance.

> p. DO use the hoist manufacturer's recommended parts when repairing a hoist.

(*Id.* at 8.) The Manual also sets out "periodic inspection procedures" for preventive maintenance

services. (Burkey Decl. Ex. A at 9.) The Manual recommends inspection of the upper suspension

every 30 days:

> (5) Inspect threaded upper suspension bushing. Verify keeper is in place against
> flat of suspension bushing, and securing screw and lock washer are in place and
> tight.

(*Id.* at 12.)

Pierce's maintenance supervisor, Benji A. Roundtree stated that Pierce's hoists are used

daily and that under OSHA rules, must be inspected annually. (English Decl. Ex. 3, Roundtree

Dep. 19:4-13.) Pierce used an outside vendor to conduct the required annual inspections. (*Id.*,

Roundtree Dep. 20:15-18.) Roundtree acknowledged that Pierce did not perform 30-day

inspections of its hoists. (Corbett Decl. Ex. 5, Roundtree Dep. 68:21–69:12.) The only regularly

conducted inspections of the hoists were pre-use visual inspections by individual users, which

did not include examining the upper hook assembly. (*Id.*, Roundtree Dep. 20:19–21:4.)

\ \ \ \ \

**B.** *Pierce Purchases the Hoist*

On July 24, 2014, CMC sold and shipped a 1-ton Budgit Manguard Hoist (the Hoist) without suspension to ACE, one of its distributors. (Burkey Decl. Ex. I (attaching invoice showing sale of Hoist serial number AH4184WG from CMC to ACE); Decl. Annyika Corbett Supp. Konecranes Mot. Summ. J. Ex. 2, ECF No. 56-2.) On August 7, 2014, Pierce ordered a CMC 1-ton Budgit Manguard Hoist with an upper hook suspension assembly from Konecranes. (*Id.* Ex. 3.) To fill the order, on August 19, Konecranes purchased the Hoist with an upper hook suspension from ACE. (Corbett Decl. Ex. 4.) On August 20, ACE installed the upper hook assembly on the Hoist using a CMC upper hook assembly mounting kit, part number LT913730. (Decl. Aaron Guest Ex. 302 (attaching invoice for Hoist and upper hook mounting kit), ECF No. 52-1.) After installing the upper hook assembly onto the Hoist, ACE load-tested it to 125 percent of capacity. (Guest Decl. Ex. 302 at 2-4 (attaching certificate of load test for Hoist serial number AH4814WG).) On August 20, ACE shipped the Hoist with the attached upper hook assembly directly to Pierce, according to Konecrane's instructions. (Guest Decl. ¶ 5; Decl. Kevin J. English Exs. 5-7, ECF No. 53-8.) Pierce installed the Hoist onto the jib crane[4] after receiving it from ACE.

**C.** *Konecranes Repairs the Hoist*

In December 2014, Pierce sent the Hoist to Konecranes for repairs. (English Decl. Ex. 9 (attaching service report).) Pierce reported that the chain was jumping over the pocket wheel. (Decl. Mike Patritto ¶ 8 & App. A (attaching job repair file for work performed on Hoist serial

---

[4]    A jib crane is a lifting device with a boom that extends off the main body at a fixed angle. collinsdictionary.com/us/dictionary/english/jib-crane (last visited November 16, 2022). A hoist is attached to the boom and performs the lifting. *Id.*

number AH4814WG).) Konecranes inspected the Hoist and recommended replacing the chain, chain guide, power cord, and several components within the gear case housing, including a sprocket, ball bearing, retainer ring, o-ring, and the gear gasket case. (Patritto Decl. ¶ 10, App. A at 3.) Konecranes requested a quote from ACE for the Budgit Hoist replacement parts. (*Id.* App. A at 10-16 (listing parts needed and quote from ACE).) On January 5, 2015, Konecranes proposed to repair the Hoist for Pierce subject to its "Crane Pro Services Standard Terms and Conditions of Sale." (*Id.* App. A at 20-26, 29.) Pierce reviewed Konecranes' proposal and returned a purchase order for the repairs on February 13. (*Id.* App. A at 28.) Konecranes purchased the necessary parts to complete the repairs from ACE. (*Id.* App. A at 39-43 (attaching purchase order for items on parts list).) The repairs to the Hoist were completed in late March 2015 and the Hoist was returned to Pierce. (*Id.* App. A at 31.) When Pierce received the repaired Hoist from Konecranes, Pierce's maintenance technician Benji Roundtree and an assistant attached the Hoist to the jib crane in Pierce's facility. (Corbett Decl. Ex. 5 (attaching deposition of Benjie Roundtree (Roundtree Dep. 32:14-20), ECF No. 56-5.)

It is undisputed that none of the parts identified in Konecranes' job repair file are for the upper hook assembly. (Patritto Decl. ¶ 9.) It is also undisputed that none of the 2015 requested repairs involved the upper hook assembly, the keeper plate, or connections between the Hoist housing and hook assembly. (*Id.* ¶ 7.)

**D.**    ***Coonrod's Employment at Pierce and the Accident***

Coonrod worked at Pierce as a welder fitter from 2007 to 2018. (English Decl. Ex. 4, Coonrod Dep. 16:14-24, ECF No. 53-5.) Coonrod mostly worked in the "boom area" of Pierce's facility where he took parts and made them into a product by welding, cutting, and fitting them together. (*Id.*, Coonrod Dep. 19:12-15.) Coonrod described that he used the Hoist for his work to

Page 7  – OPINION AND ORDER

lift parts onto his work table, and that he would use the Hoist for about four hours on a particular day, then not use the Hoist for two to three days. (*Id.*, Coonrod Dep. 73:1-10.) Coonrod stated that on the day of the accident, he was working in the boom area. (*Id.*, Coonrod Dep. 19:12-25.) Coonrod described that before working that day, he visually inspected the jib crane by "running the chain down, inspected the chain, run[ning] it up; inspected the eye, the clip, make sure that it worked, make sure the eye wasn't damaged; inspected the pendant, rolled it back and forth, swung the arm back and forth, and that was it." (*Id.*, Coonrod Dep. 27:8-16.)

On July 13, 2016, Coonrod welded two pieces of metal (called "ears") together. (*Id.*, Coonrod Dep. 47:2-9.) Coonrod described that after doing so, he needed to remove a 4x4 piece of lumber from underneath the ear to prepare to move the ear from his work table. (*Id.*, Coonrod Dep. 48:20-25.) To remove the lumber, Coonrod planned to lift the ear with the jib crane Hoist. (*Id.*, Coonrod Dep. 50:8-14.) Coonrod then attached a magnet connected to the Hoist's chain to the ear. (*Id.*, Coonrod Dep. 49:19-25.) Coonrod described that when he used the Hoist to lift the ear, the ear fell back onto his work table. (*Id.*, Coonrod Dep. 49:11-25.) Coonrod stated that when he looked down to determine why the ear fell, he was struck on the crown of his head by the Hoist, which had fallen from the jib crane overhead. (*Id.*, Coonrod Dep. 53:1-19.) Coonrod was standing directly underneath the jib crane at the time. (*Id.*, Coonrod Dep. 51:7-10.) Coonrod stated that he fell to his knees and that "everything went black for a few seconds." (*Id.*, Coonrod Dep. 55:22–56:2.) Coonrod was able to get himself to his feet and stated that a Pierce foreperson and employee called an ambulance, and that he was transported to the hospital. (*Id.*, Coonrod Dep. 58:10–59:3.) Coonrod was discharged a couple of hours later without medications. (*Id.*, Coonrod Dep. 82:22–83:2.) Immediately following the accident, Coonrod reported severe head pain, and that he later developed numbness in his arms and hands. (*Id.*, Coonrod Dep. 82:11-15.)

Page 8 – OPINION AND ORDER

E.     *Pierce's Accident Investigation*

The day after Coonrod's accident, July 14, 2016, Pierce's safety coordinator Rex Dingman, together with Roundtree, undertook an investigation. (English Decl. Ex. 2, Dingman Dep. 37:19–38:5.) Dingman and Roundtree found the Hoist on the floor in Coonrod's workstation and the upper hook assembly still attached overhead to the jib crane. (*Id.*, Dingman Dep. 38:16-25.) Dingman stated that he and Roundtree looked for the "locking mechanism" that keeps the hook attached the Hoist. (*Id.*) Roundtree discovered that two parts had come off the Hoist – "a retaining plate and a bolt." (English Decl. Ex. 3, Roundtree Dep. 42:13-17.) Roundtree did not find the CMC keeper plate on the Hoist or elsewhere, and found a screw on the floor next to the Hoist. (*Id.* Ex. 2, Dingman Dep. 38:19-25, 39: 5-12.) Dingman and Roundtree concluded that the screw they found came loose from the Hoist because it was the same thread type, and it had a ring of aluminum shavings on its end that matched those found in the Hoist's retaining hole. (English Decl. Ex. 3, Roundtree Dep. 43:1–44:3; Ex. 2, Dingman Dep. 39:5-12.)

Dingman prepared a written report about his accident investigation. In it, Dingman described the incident this way: "Mark Coonrod was using a jib crane to lift a large metal ear when all of a sudden the Hoist came loose from its mounted position, falling to the floor. On its way down part of it hit [Coonrod] on top of his head. It also hit his shoulder and right arm." (Corbett Decl. Ex. 8, ECF No. 56-8.) Dingman concluded:

> We discovered that the jib hoist assembly had come uncrewed from the mounting hook. This was because the retainer that keeps the hook from unscrewing had come loose. The bolt that was used to hold the retainer in place must have become loose, thus the retainer no longer could keep the hook from unscrewing.

(*Id.*) The report further provides that "More frequent Periodic Inspections may prevent this from happening in the future." (*Id.*) After the accident, Roundtree "started inspecting all of the company's Jib crane hoists" to ensure Pierce did not have other units with similar problems. (*Id.*; *see also* English Decl. Ex. 3, Roundtree Dep. 69:13-18.)

Pierce's records show that sometime after 2015, the vendor who performed its annual hoist inspections went out of business, and that a miscommunication between Pierce and the new vendor resulted in the Hoist being omitted from annual inspections. (English Decl. Ex. 15 at 2 (providing answers from Pierce General Manager Brad A. Sintak to SAIF as part of workers compensation investigation into Coonrod's claim).) Between April 2015 and July 13, 2016, there are no records of any inspection, service, maintenance, or repairs of the Hoist. (English Decl. ¶ 14.)

To put the Hoist back into service after Coonrod's accident, Dingman welded a new retaining plate using spare parts from Pierce. (Decl. Barry Goehler Ex. A, Dingman Dep. 68:20–69:19.) Dingman's retaining plate used three screws, whereas the CMC keeper plate uses one screw. (Burkey Decl. ¶¶ 5-9 & Ex. F (photograph showing keeper plate and screw installed on 1-ton Manguard Hoist); Scheibe Decl. Figure 6 (photograph showing Dingman's three-screw retaining plate on Hoist).) Dingman attached the new retaining plate to the Hoist using the same screw he found on the floor and put the screw through the plate into the retaining hole to affix the hook to the Hoist's housing. (Goehler Ex. A, Dingman Dep. 70:19–71:3.)

\ \ \ \ \

\ \ \ \ \

**F.**    ***The Parties' On-Site Visit and Inspection of Hoist***

Page  10  – OPINION AND ORDER

On April 30, 2019, the parties conducted a site visit at Pierce to inspect the Hoist. ACE's engineer, Robert R. Scheibe, Ph.D., and CMC's Senior Engineering Advisor John R. Burkey III participated in the inspection, as did Coonrod's engineer Scott E. Buske, P.E. (Decl. Robert R. Scheibe, ECF No. 52-2; Decl. John R. Burkey III, ECF No. 53-18; Decl. Scott E. Buske, ECF No. 59-1.) Scheibe and Burkey inspected the Hoist and took measurements of the screw and retaining hole. During the inspection, Scheibe took photographs of the Hoist, the upper hook assembly, the retaining plate fabricated by Dingman, and the three screws securing the retaining plate to the Hoist. (Scheibe Decl. ¶ 8.)

Scheibe found that the retaining plate on the Hoist was larger than the CMC keeper plate. Scheibe noted that the retaining plate had three screws that fit over three holes in the Hoist. (Scheibe Decl. ¶ 9.) Scheibe also noted that the hole closest to the hook was a "blind hole," meaning it had a fixed depth of .825 inches. (*Id.*) The other two holes were "through holes," meaning that they were drilled through the Hoist's body. (*Id.*) Scheibe also measured the screw that was in the blind hole. (*Id.* ¶ 10.) Scheibe found that the screw had about 25 threads, was ¼ inches in diameter, and was 1.25 inches long. (*Id.*)

During the inspection, Burkey found that there was no CMC keeper plate on the Hoist. Instead, there was a welded metal piece attached to the Hoist with three metal screws, each with two washers. (Burkey Decl. ¶ 33.) Two of the screws were installed in holes in the Hoist intended for lug assemblies. (*Id.* ¶ 34.) The third screw was installed in the retaining hole. (*Id.* ¶¶ 34-36.) Burkey found that the third screw from the retaining hole had a threaded length of 1.25 inches and did not appear to have any locking adhesive bonded to its threads. (*Id.* ¶¶ 37.) Burkey concluded that the third screw was not a CMC screw because CMC screws are .75 inches long and have adhesive bonded to the threads. (*Id.* ¶ 37.) Burkey found the depth of the retaining hole

Page 11  – OPINION AND ORDER

is .825 inches. (*Id.* ¶ 40.) Burkey concluded that the third screw was too long to fit into the retaining hole, and thus prevented the CMC lock washer from engaging and fully tightening against the CMC keeper plate. (Burkey Decl. ¶¶ 44-45.) Burkey also concluded that the third screw was too long for the retaining hole and prevented the upper hook assembly from operating as designed. (*Id.* ¶ 46.)

Buske stated that Dingman found the slightly longer screw after the accident and reused it in the Hoist. (Buske Decl. ¶ 6.) Buske stated that Dingman manufactured a larger keeper plate than the manufacturer's original and used three screws to affix the upper assembly to the Hoist. (*Id.*) Buske stated that Dingman did not use locking adhesive on the screw he put into the "blind hole" and that Dingman used three washers to prevent the screw from "bottoming out." (*Id.*) Buske observed that CMC supplies a "screw with blue locktite already on the screw" and he concluded that if the keeper plate used a through hole and not a blind hole, the longer screw would not have bottomed out. (*Id.*) Additionally, Buske concluded that "[i]f the screw had blue locktite applied to it, this incident would not have occurred." (*Id.*) Buske opined that the Hoist's failure was due to multiple factors including:

> the failure to use Locktite on the subject screw; the failure to have a torque marker; the use of a screw that was too long; the use of only one screw to affix the housing, instead of three; the failure to warn users to be sure to use Locktite; and the failure to warn users to be sure to use torque markers; and the fact that the defect of the screw "bottoming out" was hidden and not necessarily some[thing] one might see upon visual inspection.

(*Id.* ¶ 8.)

\ \ \ \ \

## G.    *Coonrod's Action and Summary Judgment Motions*

On July 13, 2018, Coonrod commenced this action against CMC and Konecranes, alleging claims of product liability and negligence. (Compl., ECF No. 1.)

- Claim 1 is a strict product liability claim (ORS § 30.920) against CMC that alleges that CMC's Hoist was defective and unreasonably dangerous because the defects were hidden, the threads were too fine or too few, the screw was improperly affixed in the Hoist's housing, there were inadequate redundancies, and the hook was inadequately affixed to the Hoist's housing. (*Id.* ¶ 10.)

- Claim 2 is a common-law negligence claim against CMC that alleges that CMC negligently designed, manufactured, and sold the Hoist in a manner that would avoid foreseeable harm and breached its duty to him by to manufacturing a defective product, failing to warn of these defects, failing to maintain the Hoist, and failing to inspect the Hoist. (*Id.* ¶ 15.)

- Claim 3 is a common-law negligence claim against Konecranes that alleges that Koncranes, in servicing the Hoist, violated its duty to Coonrod by using a hook with screw threads that were too fine, too few, or of poor quality; not properly affixing the screw in the Hoist's housing; not ensuring proper redundancies; inadequately affixing the Hoist to the hook, failing to warn of defects, and failing to properly inspect the Hoist. (*Id.* ¶ 19.)

- Claim 4 is a strict product liability claim (ORS § 30.920) against Konecranes that alleges that Konecranes, in selling and servicing the Hoist, had a duty to avoid foreseeable harm to him, and violated its duty by using a screw with too fine or too few threads; failing to ensure redundancies; having inadequate fixation of the Hoist to the hook; failing to warn of these defects; failing to maintain the Hoist; and failing to inspect the Hoist. (*Id.* ¶ 23.)

On October 10, 2018, Konecranes filed a third-party complaint against ACE. (Third-Party Compl., ECF No. 17.) In its answer, ACE asserts a cross-claim against CMC for common law indemnity. (CMC Ans. & Cross-claim, ECF No. 25.)

CMC, Konecranes, and ACE move for summary judgment against Coonrod's product liability and negligence claims because it is undisputed that the accident was caused by modifying how the Hoist was attached to the upper hook by using the replacement screw, and that Coonrod has failed to meet his *prima facie* burden of showing the modification was not essential to the accident. In defendants' view, Coonrod has not created a genuine issue of

material fact on his product liability and negligence claims and they are entitled to summary judgment on Claims 1 through 4. Konecranes also contends that summary judgment is appropriate on Coonrod's negligence Claim 3 because he has not created a genuine issue of material fact that its service of the Hoist was a cause of his injury.

CMC moves for summary judgment on ACE's crossclaim for common law indemnity, contending that because Coonrod's negligence claim fails, ACE's claim for common law indemnity fails as a matter of law under ORS § 31.610. ACE moves for summary judgment against Konecrane's third-party common law claims for indemnity and contribution contending they fail as a matter of law. ACE further argues that Konecrane's third-party claim for contractual indemnity fails as a matter of law because the indemnity provision upon which Konecranes relies was not conspicuous. The court conducted oral argument on the parties' motions on February 16, 2023. The court begins with defendants' motions against Coonrod's claims, then it addresses Konecranes' third-party claims and ACE's crossclaim.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, on unsupported conjecture, or on conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing

Page 14  – OPINION AND ORDER

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). But deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1309 (D. Or. 2016). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## DISCUSSION

**A.    *Design Defect Claims (Claims 1 and 4)***

Defendants move for summary judgment on Coonrod's design defect claims, arguing that it is undisputed the Hoist was modified post-sale, and that the evidence fails to show that the modification was not essential to his injury. Coonrod responds that the evidence amply creates issues of fact on causation, contending that several substantial factors caused his injury. The court agrees with defendants.

**1.      Legal Standards**

ORS § 30.920 imposes strict liability on a manufacturer for injuries caused by its product if the product is "both defective and unreasonably dangerous." *Purdy v. Deere & Co.*, 311 Or. App. 244, 247, *rev. denied*, 369 Or. 110 (2021) (citing *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 77 (2001)). Under Oregon law, the necessary elements of a strict-liability design-defect case are:

> (1) the sale or leasing of a product by one engaged in the business of selling or leasing such products; (2) a product that was expected to, and did, reach the user or consumer without substantial change in condition; (3) a product that, when sold, was in a defective condition unreasonably dangerous to the user or consumer; (4) injury to the user or consumer, or damage to his or her property; (5) that was caused by the product's defective condition.

*McCathern*, 332 Or. at 77 n.15. Further, strict liability for a design-defect case is governed by the consumer-expectations test. *McCathern*, 332 Or. at 79; *Bowden v. United Rentals (N.A.), Inc.*, Case No. 3:17-cv-1411-SI, 2020 WL 5507528, at *5; *Chong*, 152 F. Supp. 3d at 1317. This test requires a plaintiff to prove that, "when the product left the defendant's hands, the product was defective and dangerous to an extent beyond that which the ordinary consumer would have expected." *McCathern*, 322 Or. at 79. "'Whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury.'" *Purdy*, 311 Or. App. at 248 (quoting *McCathern*, 332 Or. at 78). A trial court must ensure that the "evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect." *McCathern*, 322 Or. at 79. "Because ORS § 30.910 creates a rebuttable presumption that a product is not defective, 'a plaintiff may not rely on the bare assertion of a defect from which a jury may infer unreasonable dangerousness; rather, a party must affirmatively put forth some evidence on the issue of dangerousness before the issue may

properly be submitted to a jury.'" *Bowden*, 2020 WL 5507528, at *5 (quoting *Russell v. Deere & Co.*, 186 Or. App. 78, 83 (2003)).

Along with presenting evidence about the defective and unreasonably dangerous condition of the Hoist, Coonrod must establish causation. Oregon's causation standard demands that "a plaintiff need only show that 'the defendant's conduct was . . . one of the causes of her injury.'" *Smith v. Ethicon, Inc.*, Case No. 3:20-cv-00851-MO, 2022 WL 1909019, at *1 (D. Or. June 2, 2022) (quoting *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 339 (2004)). "This requires that a plaintiff introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough[.]" *Chong*, 152 F. Supp. 3d at 1317 (simplified); *see also Hudjohn v. S&G Mach. Co.*, 200 Or. App. 340, 353 (2005) (holding that that expert's opinion must establish a probability of causation).

Additionally, when there is evidence of a post-sale modification to the product, to survive summary judgment, a plaintiff must make a *prima facie* showing that: "there must be evidence from which it could be found that no change in the condition of [the product] had been made from the time of its purchase which was essential to the cause of the loss." *Seeborg v. Gen. Motors Corp.*, 284 Or. 695, 699 (1978). Thus, to satisfy this burden, Coonrod "must prove that it is more likely than not" that the Hoist's detachment from the hook "was caused by a dangerously defective condition existing at the time of its purchase." *Seeborg*, 284 Or. at 702-03.

\ \ \ \ \

### 2.    Analysis

Defendants argue that there is no genuine issue of fact that the Hoist was not defective when it was sold and that Coonrod's injury was not caused by their product. Defendants contend

Page 17  – OPINION AND ORDER

that they are entitled to summary judgment on Coonrod's strict product liability claims because it is undisputed that the Hoist was modified by installing the replacement screw, the replacement screw was essential to the loss, and that Coonrod has identified no evidence showing that the Hoist was defective when it left their hands sufficient to carry his *prima facie* burden. Defendants rely *Seeborg*, 284 Or. at 702. In *Seeborg*, the plaintiff bought a new car manufactured by defendant. *Id.* at 697. Sometime after purchasing the car, a fuse burned out and was replaced. *Id.* After the fuse again burned out, it was replaced with a "stronger" fuse, presumably of greater amperage than the limit stated in the owner's manual. *Id.* at 698. After the stronger fuse was installed, the car was destroyed by a fire while the car was parked in the driveway. *Id.* Evidence existed showing that the vehicle as purchased had defective wiring. *Id.* at 703. General Motors was granted summary judgment on the plaintiff's product liability claim. *Id.*

On appeal, the plaintiff argued that the trial court erred because General Motors failed "to show that the installation of the (stronger) fuse was the proximate cause of the fire." *Id.* at 701. The *Seeborg* court disagreed:

> Plaintiff mistakes the burden which defendants have in establishing their right to summary judgment. Defendants do not have to establish that the stronger fuse was the cause of the fire; what they do have to establish is that because of the installation of the stronger fuse plaintiff cannot carry his burden to show that there was no change in the vehicle which was essential to its destruction by fire and, thus, that it was dangerously defective at the time of its purchase. The two are not the same. All defendants have to show is that the admitted factual posture of the case is such that plaintiff would not be entitled to a jury determination. They have to show that the facts are insufficient to establish that the defective condition of the vehicle which caused its destruction was dangerous at the time it was sold.

*Seeborg*, 284 Or. at 701. The *Seeborg* court acknowledged that it was unknown whether the replaced fuse was of higher amperage than that specified in the manual because the replaced fuse was destroyed in the fire, and that although there was evidence of faulty wiring, the original fuse

was designed to prevent the vehicle from catching fire. *Id.* at 702. In other words, even if the vehicle could have been found to be defective at the time of purchase, it did not become dangerously defective until the plaintiff installed the stronger fuse. *Id.* at 703. The *Seeborg* court concluded that because the plaintiff failed to produce evidence that it was more likely than not that "the vehicle's destruction was caused by a dangerously defective condition existing at the time of its purchase," the trial court properly granted summary judgment to the defendants. *Id.* at 702-03; *see also Ensley v. Strato-Lift, Inc.*, 116 F. Supp. 2d 1175 (D. Or. 2000), *adhered to on recon.*, 134 F. Supp. 2d 1191, 1192 (2001) (applying *Seeborg* and denying summary judgment because issues of fact existed about whether modification caused the loss and whether product was unreasonably dangerous when it left the manufacturer's hands).

Viewing the evidence in the light most favorable to Coonrod here shows that he is unable carry his *prima facie* burden. Coonrod fails to show a genuine issue of material fact on either critical inquiry: (1) that a defect existed in the Hoist at the time it was designed, manufactured, or sold; or (2) that the modification was not essential to the cause of the accident. CMC points to evidence from Burkey, who inspected the Hoist and found that the replacement screw was too long for the retaining hole, which prevented the replacement screw from engaging with the CMC locking washer, and prevented the CMC keeper plate from securing the mounting hook as designed. (Burkey Decl. ¶¶ 36-37; Scheibe Decl. ¶¶ 11-12.) Burkey states that the CMC screw "has a locking adhesive bonded to its threads, which prevents the screw from backing out." (Burkey Decl. ¶ 10 & Ex. G (attaching photo of CMC screw with blue locking adhesive), ECF No. 53-25.) Finally, Burkey attests that CMC has no record of any claims involving any Manguard Hoist – warranty or legal – asserting that a CMC screw came loose from the upper

assembly, releasing the keeper plate and permitting the upper hook to become unscrewed from the Hoist's body. (Burkey Decl. ¶ 47.)

Coonrod attempts to satisfy his *prima facie* burden here by contending that that the replacement screw was not "essential" to the loss and that multiple factors contributed to the accident. Coonrod points to a declaration from engineer Scott E. Buske, who states that he participated in the inspection of the Hoist on April 30, 2019. (Buske Decl. ¶ 5, ECF No. 59.) Buske observed that Dingman reused the slightly longer screw in the Hoist and welded a larger keeper plate using three screws "to add redundancy." (*Id.* ¶ 6.) Buske also observed that the replacement screw used by Dingman did not have a locking adhesive on it, and that Dingman did not apply "blue locktite" (a locking adhesive) to the threads. (*Id.*) Buske concludes that the Hoist's failure was due to several factors, including failing to use a locking adhesive, failing to use torque markers, using a screw that was too long, using only a single screw, failing to warn individuals to use a locking adhesive and torque markers, and that the screw bottomed out and may not be seen on visual inspection. (*Id.* ¶ 8.) Buske further provided that "[t]he use of too long a screw may or may not have contributed to causation of the accident, because Locktite, additional screws, and a torque marker, individually or in combination, should have been used, and would have prevented the accident." (*Id.* ¶ 16.)

Like *Seeborg*, Coonrod's evidence fails to eliminate the modification – using the replacement screw – as a causal factor. The crux of Coonrod's argument is that multiple factors caused the accident, including failing to use a design with additional redundancies (three screws instead of one, using torque markers, using a larger keeper plate). Coonrod misapprehends his burden here. Simply offering other potential design ideas fails to provide affirmative evidence

from which a jury could infer that the Hoist was unreasonably dangerous when it left defendants' hands or that the modification was not essential to the accident.

Testimony from Coonrod's own engineer proves this point: "[i]f the screw had blue locktite applied to it, this incident would not have happened" and that CMC "supplies a screw with blue locktite already on the screw." (Buske Decl. ¶ 6.) Buske also provides that "[t]hreadlocking glue offers a more permanent solution for fortifying joints" and is "why [CMC] generally supplies the screw with the blue locktite applied to it." (*Id.* ¶ 7.) And, Buske states that using too long a screw "may or may not have contributed to causation of the accident." (*Id.* ¶ 16.) In other words, Coonrod's own engineer admits that had the CMC screw been used, the accident would not have happened. Thus, Buske's testimony does not eliminate the replacement screw as a causal factor and essential to the accident.

Coonrod next argues that even if the replacement screw was the sole cause of the accident, it was reasonably foreseeable that someone might use a different screw, pointing to Buske's attestation that "screw and bolts are usually interchangeable." (Buske Decl. ¶ 11.) Contrary to Coonrod's argument, even if it is true that "screws and bolts are usually interchangeable" Buske's statement fails to create a genuine issue of material fact for trial. Coonrod points to no evidence that replacing this specific CMC screw with a different screw in the Hoist was reasonably foreseeable, such that the Hoist was unreasonably dangerous when it left defendants' hands. Coonrod offers no evidence challenging Burkey's statement that CMC has *zero* recorded claims of any CMC screw coming loose or backing out of the upper hook assembly in over 63,000 Manguard Hoists sold.[5] Thus, Coonrod presents no evidence that

---

[5]    The only response from Coonrod to this evidence from Burkey is to argue that engineers should plan for redundancies. (Pl.s' Mem. Opp'n CMC Mot. Summ. J. at 5, ECF No. 59.)

showing that the Hoist, as designed, manufactured, and sold – using the CMC screw that comes with the blue adhesive bonded to its threads – was defective and unreasonably dangerous when it left the defendants' hands. *Cf. Jones v. General Motors Corp.*, 139 Or. App. 244, 262 (1996), *aff'd*, 325 Or. 404 (1997) (holding plaintiff submitted evidence creating issue of fact that car was defective when it left defendant's control); *Ensley*, 134 F. Supp. 2d at 1195 (noting plaintiff's expert "states that the lift was dangerously defective when it left Strato-Lift's hands"). Coonrod may not rely on his "bare assertion of a defect" but must "affirmatively put forth some evidence" that the Hoist was defective and unreasonably dangerous. *Chong*, 152 F. Supp. 3d at 1317. Therefore, Coonrod fails to identify any affirmative evidence creating a genuine issue of material fact that dangerous defects existed in the Hoist when it left defendants' hands sufficient to carry his *prima facie* burden on his strict product liability claims.

Coonrod argues that there is no evidence that Pierce employees installed the replacement screw and that the court should reasonably infer that Konecranes installed the replacement screw because it was the last party[6] to "touch the upper housing." (Pl.'s Mem. Opp'n to ACE Mot. Summ. J. at 2, ECF No. 60.) Coonrod contends that Konecranes' servicing documentation is inadequate to eliminate the possibility that it may have installed the replacement screw. (*Id.* at 2-3.) In Coonrod's view, because it is unknown who is responsible for installing the replacement screw, a material question of fact exists precluding summary judgment. The court disagrees.

---

[6]     Coonrod appears to concede that the evidence is undisputed that CMC shipped the Hoist to ACE without the upper hook assembly suspension, and that ACE installed the upper hook assembly using CMC-approved parts. Burkey Decl. Ex. I; Guest Decl. Ex. 302; English Decl. Exs. 5-7.

Contrary to Coonrod's suggestion, Konecranes submitted a comprehensive job repair history report detailing the nature of the repairs to the Hoist requested by Pierce and an itemized list of CMC-approved parts it ordered from ACE to perform those repairs. Konecranes' job repair history shows that none of Pierce's requested repairs involved the upper hook assembly and none of the parts Konecranes used to repair the Hoist included a screw or parts for the upper hook assembly. (Patritto Decl., App. A at 10-16, 39-43.) Coonrod presents no evidence rebutting Konecranes' repair history report, and he instead argues that because the repairs to the Hoist were costly, the court should infer that the repairs also included the upper hook assembly. Yet Coonrod presents no evidence linking Konecranes, ACE, or CMC to the replacement screw. Therefore it is just as likely that someone at Pierce replaced the screw as someone Konecranes. *See Seeborg*, 284 Or. at 702-03 (granting summary judgment because no inference could be drawn about the amperage of the replacement fuse, the jury would not be permitted to speculate). That it is unknown who installed the replacement screw does not create an issue of fact that prevents summary judgment.

In summary, on this record, the court concludes that Coonrod has identified no material issues of fact showing that the Hoist was defective and unreasonably dangerous when it left CMC, ACE, or Konecranes' hands, and that modification was not essential to the loss necessary to satisfy his *prima facie* burden on his product liability defective-design claims under ORS § 30.920(1)(b). Accordingly, CMC and Konecranes' motions for summary judgment on Claims 1 and 4 are granted.[7]

---

[7]    Because the court concludes that Coonrod has not carried his *prima facie* burden on his product liability claims, the court declines to address the parties' arguments on defendants' modification affirmative defense under ORS § 30.915.

**B.**    *Claim 2 – Negligence Against CMC*

In Claim 2, Coonrod alleges that CMC negligently designed, manufactured, and sold the Hoist with threads on the hook that were too fine, too few, and insufficient; the screw was improperly affixed the upper hook assembly to the Hoist; that CMC failed to adequately warn of the defects; and CMC failed to adequately inspect or maintain the Hoist. (Compl. ¶ 15.) The negligence allegations against CMC are properly characterized as falling within the scope of the products liability statutory scheme. *See Simonsen v. Ford Motor Co.*, 196 Or. App. 460, 468-70 (2004) (discussing different types of negligence claims); *Martell v. General Motors LLC*, 492 F. Supp. 3d 1131, 1142 n.2 (D. Or. 2020) (providing that "if the gravamen of a cause of action is a product defect, regardless of theory, then Oregon's product liability statutory framework, including its statute of limitations, statute of repose, and requirements relating to manufacturers and distributors, will govern the cause of action); *Ruiz v. Hammer& Nails, LLC*, Case No. 2:10-cv-1021-SU, 2013 WL 5436604, at *4 n.4 (D. Or. Aug. 13, 2013) (observing that claims asserting "negligent conduct before the sale of a product would be subject to the product liability statute, whereas a post-sale claim for negligence would not be subject to that statute"), *adopted in relevant part* 2013 WL 5436581 (Sep. 27, 2013).

To establish product liability negligence under Oregon law, "'a plaintiff must show that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the plaintiff harm.'" *Johnson v. Medtronic Inc.*, Case No. 6:20-cv-00599-MK, 2021 WL 2669560, at *5 (D. Or. June 10, 2021), *adopted* 2021 WL 2668793 (June 29, 2021) (quoting *Clement v. Ecolab, Inc.*, 341 F. Supp. 3d 1205, 1214 (D. Or. 2018)). "When a defendant's negligence is a factual cause of harm to the plaintiff, the defendant is subject to liability to the plaintiff as long as the harm that the plaintiff suffered was a reasonably foreseeable result of the

Page 24  – OPINION AND ORDER

defendant's negligence." *Lasley v. Combined Transp., Inc.*, 351 Or. 1, 7 (2011). *See also Roach v. Kononen*, 269 Or. 457, 465 (1974) (distinguishing defective-design and negligence claims, noting that negligence focuses on "the reasonableness of the manufacturer's actions in designing and selling the article" given the known risks at the time whereas strict liability design defect focuses on the "condition (dangerousness)" of the article).

Coonrod has not shown an issue of fact exists that the Hoist was defective and unreasonably dangerous when it left defendants' hands, including failing to rebut the evidence that there have been no reports of similar incidents involving replacement screws and any Manguard hoists coming loose from their upper hook assemblies. Without any known risks, Coonrod has not created an issue of fact showing it was reasonably foreseeable that he could be injured by CMC's actions in designing and selling the Hoist. For this same reason, Coonrod has not created an issue of fact on his negligence claim premised on the adequacy of CMC's warnings to use only CMC replacement parts. Absent any identified known risks, Coonrod fails to create an issue of fact showing that it was reasonably foreseeable he would have been injured due to CMC's failure to provide a more specific warning about the screw (using only a CMC screw, using locktite, not using too long a screw). As a result, CMC is entitled to summary judgment on Claim 2 (negligent product liability).

**C.    *Claim 3 – Negligence Against Konecranes***

In Claim 3, Coonrod alleges that Pierce purchased the Hoist from Konecranes in August 2014, and that Konecranes serviced the Hoist sometime between January and April 2015. (Compl. ¶ 19.) Coonrod alleges that Konecranes had a duty to exercise due care and violated that duty when it used a hook with threads that were too fine, too few, and insufficient; the screw improperly affixed the upper hook assembly to the Hoist; failed to ensure redundancies existed in

Page 25  – OPINION AND ORDER

the design; inadequately affixed the upper hook assembly to the Hoist; failed to warn of these defects; and failed to properly inspect the Hoist. (Compl. ¶ 19.) The negligence allegations in paragraphs 19(a) through (f) are properly characterized as falling within the scope of the products liability statutory scheme because they are alleged to have occurred before the sale of the Hoist. *Ruiz*, 2013 WL 5436604, at *4 n.4. Like the allegations against CMC, given the absence of any known risks as discussed above, Coonrod has not created an issue of fact showing that it was reasonably foreseeable that he could be injured by Konecranes' actions in selling the Hoist. As a result, CMC is likewise entitled to summary judgment on Claim 3 paragraphs 19(a) through (f) (negligent product liability).

In paragraph 19(g), Coonrod alleges that Konecranes failed to properly inspect the Hoist when servicing the Hoist in early 2015. Because this allegation occurred post-sale, it is properly construed as a common law negligence claim. *Ruiz*, 2013 WL 5436604, at *4 n.4. To establish this claim, Coonrod must prove: (1) Konecranes' conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that Konecranes' conduct was unreasonable given the risk, (4) that Konecranes' conduct was a cause of his harm, and (5) that Coonrod was within the class of persons and his injury was within the general type of potential incidents and injuries that made Konecranes' conduct negligent. *Stewart v. Kids Inc. of Dallas, OR*, 245 Or. App. 267, 275 (2011); *Or. Steel Mills*, 336 Or. at 327-28 (discussing that Oregon uses the concept of foreseeable risk of harm in lieu of duty of care in common law negligence claims).

Coonrod must establish Konecranes' conduct was the "cause-in-fact" of his injuries. *Cederberg v. Legacy Health*, Case No. 3:18-cv-02044-HZ, 2020 WL 5809991, at *7 (D. Or. Sept. 28, 2020) (citing *Chapman v. Mayfield*, 358 Or. 196, 205 (2015)). Evidence of causation

Page 26  – OPINION AND ORDER

cannot be left to surmise or conjecture; it "must have the quality of reasonable probability, and a mere possibility that the alleged negligence of the defendant was the proximate cause of [the] plaintiff's injuries is not sufficient." *Trees v. Ordonez*, 354 Or. 197, 218 (2013) (quoting *Sims v. Dixon*, 224 Or. 45, 48 (1960)).

Konecranes moves for summary judgment contending that Coonrod cannot establish that its conduct was a cause-in-fact of his injury because he offers no evidence creating an issue of fact on two points: (1) that Konecranes was responsible for installing the replacement screw when it serviced the Hoist; or (2) the replacement screw was installed before 2015 such that Konecranes' inspection of the Hoist failed to discover the replacement screw. On its first point, Konecranes argues its detailed job repair file establishes that its service work did not involve the upper hook assembly and that Coonrod has failed to come forward with any evidence establishing a causal link necessary to survive summary judgment. On the second point, Konecranes argues that Coonrod identifies no evidence that the replacement screw was installed before its service work in 2015, and that its alleged failure to inspect and discover the replacement screw rests on pure speculation and surmise. Konecranes contends that absent evidence that the modification occurred before its service, Coonrod fails to create a genuine issue of fact that its conduct was the cause-in-fact of his injuries. In Konecranes' view, because Coonrod has presented no evidence that its conduct was the cause-in-fact of his injury that rises above the merely possible, summary judgment should be granted.

Coonrod responds that, because Konecranes was the last person to service in April 2015, and because the service performed was expensive, a reasonable "inference may be made that Konecranes was the party that put in the wrong screw." (Pl. Mem. Opp'n Konecranes at 3.) During oral argument, Coonrod also suggested that swapping out a screw is such a minor repair,

Page 27  – OPINION AND ORDER

it may reasonably be inferred that it was not included in the repair history. The court disagrees

for two reasons.

First, Konecranes submitted a very detailed job repair history that specifically sets out the

nature of the repairs requested and performed, and identifies each CMC replacement part ordered

and used in servicing the Hoist. None of the parts used corresponds with parts for the upper hook

assembly and none of the parts used were a screw. (Patritto Decl. ¶ 8 & App. A.) Coonrod

presents no evidence refuting Konecranes job repair history. In light of Konecranes'

uncontradicted evidence, the court may not infer that Konecranes simply installed "the wrong

screw" and forgot to include that information in the repair history.

Second, Coonrod's argument that Konecranes' failure to inspect the upper hook portion

of the Hoist caused the accident misses the mark. Coonrod identifies no evidence that the

replacement screw was installed before Konecranes' service of the Hoist in early 2015 or that it

asked Konecranes to examine the upper hook assembly. Konecranes' servicing records contain

no mention of the upper hook. And, Coonrod's contention about Konecranes' alleged failure to

inspect and uncover the replacement screw contradicts his arguments elsewhere that Pierce's

failure to inspect the Hoist could not be a contributing causal factor because any defect with the

replacement screw would be hidden from view inside the Hoist's housing. In short, Coonrod

provides no evidence linking Konecranes to the accident that rises above speculation and

surmise. *Cederberg*, 2020 WL 5809991, at *7 ("Factual causation generally requires evidence of

a reasonable probability that, but for the defendant's negligence, the plaintiff would not have

been harmed.") (internal quotation omitted). Therefore, because Coonrod presents no evidence

creating a genuine issue of material fact that Konecranes is a cause-in-fact of his injuries,

Konecranes' motion for summary judgment on paragraph 19(g) of Claim 3 is granted.

Page 28  – OPINION AND ORDER

**D.**   *Defendants' Indemnity and Contribution Claims*

    **1.**   **ACE's Motion for Summary Judgment against Konecranes' Third-Party Claims is Granted**

Konecranes filed a third-party complaint against ACE alleging breach of contract (Third-Party Claim 1), contractual indemnity (Third-Party Claim 2), common law indemnity (Third-Party Claim 3), and common law contribution (Third-Party Claim 4) arising out of ACE's role in providing the Hoist to Pierce in August 2014. (Konecranes Third-Party Compl., ECF No. 17.) ACE moves for summary judgment on all of Konecranes' third-party claims. In its response, Konecranes concedes that Third-Party Claims 3 and 4 should be dismissed if defendants' motions for summary judgment are granted. Accordingly, ACE is granted summary judgment on Third-Party Claims 3 and 4. The court turns to Third-Party Claims 1 and 2, which are premised on contract principles.

On August 18, 2014, ACE sent a quote (the Quote) to Konecranes for a 1-ton capacity Budgit Manguard Electric Hoist. (Corbett Decl. Ex. 3, ECF No. 63.) On August 19, 2014, Konecranes responded to the Quote with a Purchase Order. (*Id.* Ex. 4.) The Purchase Order contains the following statement:

> "The Konecranes General Terms and Conditions of Purchase of Products 06/2009 are incorporated into and made part of this contract. The Konecranes General Terms and Conditions of Purchase of Products [General Purchase Terms] 06/2009 may be viewed at http://www.konecranes.com/portal/eng/about_us/procurement/ or are from Konecranes upon request. Inconsistent or additional terms presented by seller are void unless expressly accepted in writing and signed by Konecranes and seller[.]"

(Goehler Decl. Ex. C, ECF No. 52-3 at 95.) Additionally, the Purchase Order states that if the Purchase Order is construed as an offer by Konecranes, ACE's acceptance is "strictly limited to the terms of the offer." (*Id.*) On August 21, 2014, ACE sent an invoice with Konecranes'

Purchase Order number, which stated that the Hoist would be shipped directly to Pierce. (*Id.* Ex. 5.) ACE's invoiced price was $280.70 more than the Quote to account for the cost of shipping the Hoist to Pierce. (*Id.*)

In Third-Party Claims 1 and 2, Konecranes asserts that the Purchase Order references its General Purchase Terms, which includes an agreement that ACE would defend, indemnify, and hold Konecranes harmless for any defect arising out of the use of the Hoist. (Konecranes Third-Party Compl. ¶ 11.) Konecranes contends that ACE breached the agreement in the General Purchase Terms by refusing to defend and indemnify Konecrones, and that it is entitled to attorney fees, costs, and disbursements. (*Id.* ¶ 12.) Konecranes further contends that if it is found liable on any of Coonrod's claims, it is entitled to indemnity and attorney fees from ACE under the General Purchase Terms. (*Id.* ¶ 14.)

ACE moves for summary judgment on these claims contending that the indemnity provision is unenforceable. In ACE's view, because the indemnity provision was not specifically bargained for, it must be conspicuous to be enforceable. ACE argues that neither the Purchase Order nor the General Purchase Terms contain a conspicuous indemnity provision. (ACE Mot. Summ. J. at 10-11.) Konecranes responds that the Purchase Order and General Purchase Terms are easily readable and that ACE understood and agreed to the terms, including the indemnity provision, because it did not object.

The parties do not dispute that the sale of the Hoist from ACE to Konecranes is governed by the Uniform Commercial Code. *See generally* ORS § 72.1020 (governing sales between merchants). Under Oregon law, "[u]nless the indemnity provision was specifically bargained for, to be enforceable it must have been brought to plaintiff's attention or must be conspicuous." *Young v. Cont'l Crane & Rigging Co.*, 183 Or. App. 563, 567 (2002) (citing *Anderson v.*

*Ashland Rental, Inc.*, 122 Or. App. 508, 510 (1993)). Konecranes does not contend that it

specifically bargained for the indemnity provision or brought it to ACE's attention. Thus, to be

enforceable, the indemnity provision must have been conspicuous. *Id.* "Whether a term is

'conspicuous' or not is a decision for the court." ORS § 71.2010(2)(j). A term is conspicuous

when it is "so written, displayed or presented that a reasonable person against which it is to

operate ought to have noticed it." *Id.* Conspicuous terms include:

> (A) A heading in capitals equal to or greater in size in than the surrounding text, or
> in contrasting type, font or color to the surrounding text of the same or lesser size;
> and

> (B) Language in the body of a record or display in larger type than the
> surrounding text, or in contrasting type, font or color to the surrounding text of the
> same size, or set off from the surrounding text of the same size by symbols or
> other marks that call attention to the language.

*Id.*

The Purchase Order does not contain an indemnity provision, and the court turns its

attention to the indemnity provision presumably contained in the General Purchase Terms, which

Konecranes incorporated by reference. *See Garrett v. State Farm Mut. Ins. Co.*, 112 Or. App.

539, 544 (1992) ("When a written contract refers in specific terms to another writing, the other

writing is part of the contract."); *Am. Int'l Specialty Lines Ins. Co. v. Kindercare Learning Ctrs.,*

*Inc.*, 365 F. App'x 64, 65 (9th Cir. 2010) (noting information packet and its terms were

incorporated into subsequent agreement by reference). ACE argues that, as a matter of law, an

indemnity provision that is incorporated by reference is not conspicuous. Konecranes asserts that

the incorporated indemnity provision in the General Purchase Terms is in "easily readable type,"

is conspicuous, and thus enforceable. (Konecranes' Resp. ACE Mot. Summ. J. at 6.)

Neither ACE nor Konecranes has identified case law in their briefing that answers

whether indemnity provisions that are incorporated by reference are "conspicuous" under Oregon law. All the same, the court need not decide that issue. Although Konecranes quotes the indemnity provision language in its Third-Party Complaint (Third-Party Compl. ¶ 7, ECF No. 17), the General Purchase Terms document itself is not included in the summary judgment record. (*See* Corbett Decl., ECF No. 63; Goehler Decl., ECF No. 52-3.) When the court asked about the General Purchase Terms at oral argument and how the court should evaluate conspicuousness, Konecranes replied that quoted language in its Third-Party Complaint was sufficient. The court disagrees. Absent the General Purchase Terms document, the court is unable to assess whether the indemnity provision was printed in all capital letters, was displayed in larger type than the surrounding text, or was in a different color or font, or contained any other indicia of conspicuousness. The court concludes on this record that Konecranes has not shown the indemnity provision is conspicuous, and it is therefore unenforceable. Consequently, ACE's motion for summary judgment on Konecranes' Third-Party Claims 1 and 2 is granted.

## 2.    CMC's Motion for Summary Judgment against ACE's Crossclaim for Common Law Indemnity is Granted

ACE filed a crossclaim for common law indemnity against CMC, contending ACE acted as a distributor and sold the Hoist manufactured by CMC to Pierce without alteration. (ACE Ans., Aff. Defs. & Crossclaim, ECF No. 25.) CMC contends that ACE's crossclaim against it for common law indemnity fails as a matter of law should the court grant summary judgment to defendants on Coonrod's negligence claim, an argument unchallenged by ACE. *See* ORS § 31.610 (providing that under Oregon's comparative fault statute, a defendant may be liable only for damages caused by its own negligence). The court agrees. Accordingly, CMC's motion for summary judgment on ACE's crossclaim is granted.

**CONCLUSION**

As explained above, the court GRANTS ACE's Motion for Summary Judgment (ECF No. 52). The court GRANTS CMC's Motion for Summary Judgment (ECF No. 53). The court GRANTS Konecranes' Motion for Summary Judgment (ECF No. 55).

DATED February 27, 2023.

 

 

_____
JEFFREY ARMISTEAD
United States Magistrate Judge